Good morning, Your Honors. May it please the Court. I am Peter Recchia. I'm a California attorney and I am the appellant in this case. I'd like to leave time for a response to the argument if I could. The facts in this case demand a different conclusion and I believe the case must be reversed and remanded to the District Court. The Court held that I, as a practicing attorney, am a credit repair organization and that I violated the Credit Repair Organizations Act of the Federal. I received a retainer from plaintiffs. I performed legal work within the course and scope of the practice of law in compliance with the Fair Credit Reporting Act and the FACTA Acts by sending demand letters requesting removal of improper items be removed from my clients' credit reports demanding maximum accuracy as mandated by those laws. The Court held me to be a guild operation because I accepted money and I performed work to benefit my clients' credit. I believe that's a mistake. The Court gave no credence to my practice of law or the effect of the ruling would have. As a matter of fact, I did not receive a retainer because all of the work I do on behalf of consumers benefits their credit. I don't believe the CROA, the Credit Repair Organizations Act, came into existence to control the practice of law. But isn't that, aren't you doing exactly what that Act says is a credit whatever? And you know, the statute may be unwise, it may be unfair, but it seems to me that what you are doing exactly fits what they say makes you such a CROA. Thank you, Your Honor. May I respond to that? Two things. First of all, this Court in 2001 went into great detail of what a credit repair operation was. That was the guild operation. Thousands of letters being sent out to the credit reporting companies hoping that they won't respond back within a 30-day period, and hence the negative credit, although accurate, would fall off their, I guess, customer's credit report, thus bypassing the maximum accuracy as required by the law. When you look to the intent of the CROA, they went after the credit reporting organizations, the ones that did that. They never addressed the ones that didn't, and hence, I am the one that does not. Or every consumer out there sending letters on behalf of their clients basically are not a guild operation whose primary goal is to defeat the system by removing accurate information from the consumer's credit. But I am not unsympathetic to your argument, and I think that it may have unfortunate collateral consequences if you lose. But didn't the FTC case versus Gill say that just because the guy was a lawyer, he was not exempt from the requirements of the Act, and what is at stake here is simply a different aspect of the Act, which unfortunately says that somebody like you, who apparently represented these clients quite adequately, you couldn't take a fee in advance of performing the service. And the net effect of that may very well be that people won't get help, at least from lawyers, but how do you get around the fact that in FTC versus Gill, they said it doesn't matter if your conduct comes within the scope of the Act unless you're a lawyer? And I agree with what you're saying, because if an attorney does credit repair, they should be disbarred. I mean, basically, if they act within the system to destroy the credit system, that's illegal and immoral. No, but that simply deals with whether you're governed by the provisions of the Act. And the court said, as I read it, that just because you're a lawyer doesn't relieve you from compliance with the, whatever this Act is called. Well, compliance with not doing credit repair. And hence, that's where the dilemma is. What is credit repair? What was in your advertisement? What did it say you would do? I run legal advertisements advertising I'm going to improve people's credit, because that's what I do for a living. That's what every consumer attorney does. Isn't that repairing credit? Absolutely not. Repairing is the wrongful, demanding removal of accurate information from a consumer's credit report that's negative. That leads to not maximum accuracy, which our system depends upon. A creditor has to depend upon maximum accuracy either to grant credit to a consumer or deny it. And he relies upon the credit score. So the system is designed so that we have maximum accuracy in the credit report. The system needs people like me to defend consumers to make sure that there's not wrongful items on their credit that lowers the score so they're denied credit. Now, if we get back to the Gill case, the court was quite certain. We don't care what capacity you are. If you are a business doing credit repair, that's illegal and immoral and you fall under the Act. So by your definition, credit repair is only making, essentially, it's trying to get companies to mislead companies, to mislead creditors. But if you're making a bona fide claim, then you're not covered by the terms of the Act, is that right? That's my argument. Because when you look to the intent, all of the legislative history of the intent, it was to stop credit repair organizations. They didn't include attorneys or exclude it at the time because they didn't think they had to. Now, if you look at the, going back to the findings of the law, the very first page, it says that 1679A, that consumers have a vital interest in establishing and maintaining their creditworthiness. And then it moves down to purposes, number one, is buyers of credit service. We have to make sure that the buyers, when they buy credit service, they know what they are buying. In my case, the plaintiff ran us, did not buy credit services, so therefore this whole thing fails on my case. What did they buy from you? He bought legal services, Your Honor. And my legal services conform to the requirements of the fair credit. You may be doing everything legally except collecting fees in advance. Well, okay. And also, what was the reason for Congress saying no fees in advance? You could do it on both. Oh, that was the punishment. So in other words, if you, the whole purpose was to protect the consumer who has to be educated what he's buying. So you, the consumer, have to be aware that you're buying a service that will remove correct information, get anything off, get tax liens, get judgments off, and you have to be aware that's what you're buying. So that was the first instance. The second purpose is to protect the public from unfair or deceptive advertisement and So we're back to what a credit repair organization was. That was the intent of the law. I am not a credit repair organization. I never have been a credit repair organization. I comply with the law. I do a lot of litigation. I can't get to litigation against creditors or credit reporting companies unless I send out correspondence. I have to make demands upon them. I charge $500 for that. And I'll work on their case anywhere from three to six months. And when I'm finished, either their credit gets improved because those things that are reported incorrectly drop off. And if they don't, then we move into a situation to where we want to file litigation if the client wants to pay me a retainer. Hence, that's the same thing. I can't even, according to this ruling, I can't even charge a retainer to file litigation because my litigation will end up resulting in dropping off some sort of negative, incorrectly reported things from my clients. So I'm in a quandary. Well, contingency fees are not unknown in the law. There are many people who make a fortune on contingency fees. I'm not saying that you will, but what I'm trying to get at is why would Congress say that you couldn't be paid until you actually performed? That's as a punishment to the credit repair services. You can't get money up front. You have to wait until all your services are up front. Well, why would they punish a credit repair service, presumably who's operating on the up and up? Why would they say you can't get paid before you perform the service? And why should you be any different? No credit repair service is on the up and up. Counsel, maybe you want to address the class action aspect of this case. Thank you. Well, I mean, I've been sued as a class actor, against me, by Mr. Vannis. And the total class is 20 people, of which I believe there's only 13 in the class. And I'd like to have this class decertified. That's my other argument, because I believe the class is too small. Seven people of the 20 basically never received notice, never had the opportunity of opting out. Another discrepancy that we have, of the 13 people that actually received notice did not opt out, two of them. One of them is Vannis, which I did legal work for two years. I don't think he should be included, because he never purchased credit repair services. What he My legal services, sorry. Which he, I have in his deposition, we took his deposition, he says, I didn't want to hire credit repair services, I wanted to hire an attorney. I knew I was hiring an attorney, that's what I wanted to have hired to defend my rights. Well, that may be. But what about the people that you apparently called and discouraged from remaining in the class? I don't know about that, Your Honor. I have 30 people that I'm representing in the class action that resulted from me sending letters out, charging and retaining or sending letters out. Credit reporting company didn't, was not acting correctly with people that had filed bankruptcies. That's not my question, counsel. Apparently, there's evidence in the record that you tried to get people to withdraw from the class. Opt out. You actively pursued them and asked them to opt out. I believe the evidence is with one person, that's Acosta. He's a named plaintiff on one of the class actions that we have pending in front of Judge Carter in the same courtroom where this came from. Courthouse, sorry. We had to talk to him about the existing class action that was going on, not this one here with me. And so I'm sure there's discussions about what he wanted to do. I mean, there was a conflict? I'm sorry? There was a conflict? I mean, I think there's a conflict that he's a named plaintiff that I'm representing in a class. And he's suing you as a part of a class? Now he's suing me as part of a class. So I really believe that we need, you know, since this court went into such emphasis on describing what a guilt attorney violating the system was, not running a practice of law. He sent out no letterheads with his law firm. I did. I sue. He doesn't sue. I think we have some problems here. And I like this court. I think the system is screaming for this court to make a decision of what a non-guilt attorney is in complying with the law. Because my actions comply with the law. I've complied with the fair credit reporting law, the unfair debt collection laws. At the same time, if you read this here, any attorney that, if you read the credit reporting organizations act, any attorney that receives a retainer and works on behalf of a consumer is going to end up helping the consumer. Do you want to save him a minute and a half for rebuttal? Good morning, Your Honor. Robert Stemple on behalf of the plaintiff in class. I'd like to address a few of the points that Mr. Recchia just made. Mr. Recchia is not. He's in a different position than Mr. Gill was in Gill. Yeah, exactly. The court in Gill was describing the facts of the Gill operation of sending these thousands of letters out and pummeling the credit reporting agencies with dispute after dispute. That was the facts described in Gill. Those are not the facts described in the Ranez v. Recchia case. But nonetheless, he runs a credit repair operation because he signs people up to repair their credit. He charges them a little bit less than $500 and he promises them, and this is in the supplemental record, page 112. His brochure says, You will receive positive benefits and positive credit reports for a very reasonable fee. His advertisements in the penny saver say improve your credit score. He then charges them up front in his paperwork, and this is completely undisputed. He believes he should be exempt from the Credit Repair Organizations Act, not that he complies with the Credit Repair Organizations Act at all. The Credit Repair Organizations Act requires certain disclosures, which he admits he doesn't follow. You have the right. The statute, which is cited on page 16 of Peli's brief, says you have the right to dispute inaccurate information. But the point I want to say is, however, neither you nor any credit repair organization, credit repair company or organization, has the right to have accurate, current, and verifiable information removed from your credit report. This is exactly what he is saying he should have the right to do because he occasionally represents consumers in court on consumer matters. He wants to have Gil read as finding an exception for consumer attorneys who do Fair Credit Reporting Act cases to allow them, let's see, he said in his brief on page 5-6, a narrow definition as long as they don't have the fraudulent intent to remove accurate, negative information from consumers' credit reports, but they can go on and misrepresent to consumers in their advertising material that they will fix their credit, whether they do or they don't, and they can charge them up front. All that Congress wanted was not to punish lawyers, was not to punish credit repair organizations, but to protect consumers from these organizations that prey on consumers. What he is doing with these advertisements is he's advertising credit repair. He's getting these people to pay a nominal sum, $500 is quite nominal, and then he gets to scan their cases to see if maybe he is going to take them on as litigation clients, and some he does, some he doesn't. That gives him an advantage over the attorneys, the consumer attorneys such as myself who don't do this kind of advertising. I do some of that work as well, Your Honors, and this gentleman is advertising credit repair and taking away clients from other attorneys who do the same litigation in court. He's taking those clients from us is what he's doing, and that's what Congress designed the statute to prevent, is prevent unfair competition and false advertising. He's doing false advertising, and then he avoids it by saying I'm an attorney, I don't have to give these disclosures. Can I ask you, I'm just trying to understand the practical consequence. I mean, who is going to, let's assume we're dealing with attorneys, who is going to want to represent people without getting paid up front? A nominal sum, this is a fairly nominal sum. I don't understand from my reading of the record that your client was dissatisfied with the service that he got, that this suit was really a grudge suit because he wouldn't represent him in some litigation without fee. There's no indication that he was doing other than good work. What's the collateral consequence? Is this going to prevent, in effect, lawyers from getting involved in helping consumers? Because who's going to want to do it without getting paid in advance? Your Honor, I respectfully disagree with your understanding of the record. There is no evidence that the work that he did for my client resulted in any repair of any credit whatsoever. He sent multiple letters. After charging my client, who, when my client retained him for the service of repairing his credit, $99 up front, $79 for six months, my client was living out of his car. He needed good credit so he could apply for assisted living. He's a senior citizen. He wanted to apply for assisted living and get into a senior apartment complex, which he ultimately did because the credit fell off after seven years. All the letters that he sent over many months, he sent a series of three letters to the credit reporting agencies, these form letters that anyone from his office could have processed. Form letters did absolutely nothing to repair his credit. There's no evidence that he repaired a single item of incorrect credit from my client's credit reports. Is there evidence that he didn't? Yes. He sent the same letter every single time for months on end, and there was no evidence presented in court that a single thing was fixed. And what about, let's put that aside, but what about the concern that lawyers are not going to take these cases if they can't even be paid a nominal sum in advance? The statute requires that every consumer at a credit reporting agency I understand that. I just want to understand whether there's a collateral cost to that. The consequence is we don't charge up front for credit repair. If we want to help somebody with their credit, what we do is we say send the letter by certified mail return receipt requested to the credit reporting agencies, stating what it is you're disputing. Explain it in plain English. I have on my own website, Your Honor, free letters that people can download and they can contact me at any time. I will gladly assist them for free. I'm happy for them to do that for free. And the statute, the Fair Credit Reporting Act statute, is designed for consumers to do it directly or if they need assistance. Why are you prepared to do it for free? Why not? I'm just curious because I assume you don't want to live out of a car. I don't want to live out of a car. I assume you want to make a living. I do want to make a living. And the living is, when they violate the Fair Credit Reporting Act, the credit reporting agencies or the furnishers, there is a lawsuit there and I could take those cases on a contingency basis and as does Mr. Recchi on occasion. But I don't get people to come to me and become my clients for a nominal sum. So I get to call their case and develop it. So then if I understand it, your goal is the same as Mr. Recchi is, except that you do it by giving out an essentially free service in the hope that you will get a retainer agreement in the end that will make you some money and he's charging. I'm just asking for information. There are many attorneys in California that do credit reporting cases against credit reporting companies. And it's not a huge deal. There's plenty of cases from the Ninth Circuit of those sort of cases. But what I also want to point out is by carving out this exception for Mr. Recchi, you give him an unfair advantage over the credit reporting agencies that do provide the property disclosure and charge later. All that my client is entitled to under the Act is that once he corrects the credit, then he's entitled to get paid. Why is that such a big deal? Why is that a punishment? That is a protection of the consumer to make sure that when somebody says, I will fix your credit, that they really can do it. It's not just a false come on. Why don't you address the class action notice aspects of this case? Sure. This is a very small class. Yes, it is. It started out much bigger. And we weren't able to contact all the people that Mr. Recchi had contacted, but it started out as a class of 74. Seventy-four people were sent notice. He then contacts and gets half of them to drop out. Is there evidence that he actually contacted half of them? Yes, there is. Is it in the record? Yes, it is. There is the affidavit. Of one person. That's all we were allowed to do. Discovery had closed. We weren't allowed to reopen Discovery for purposes of finding out other people who had been solicited. But not only is it the affidavit of Mr. Acosta, he attaches and provided, and it's in the record, Your Honors, starting on page 252, opt-out letters that were provided by Mr. Recchia to opt out. When the defendant is advising members of the class on how to opt out and telling them, the reason why you should opt out is because I did such a good job for you, or that Mr. Rannis is not entitled to this. He's just a disgruntled former client of mine. Well, suppose that's all true. What's wrong with it? I mean, what's wrong with it? Why should that affect the fact that there's only 13 or 20, depending on how you count, to seven? I mean, what's wrong with him saying, look, opt out because I did a good job for you, and Recchia is only suing me because he's got a grudge against me? I don't know that. What's so terrible about that? It's just not good lawyering. What kind of a lawyer does that? He misrepresents things all the time, not only on the record, but also to prospective clients. Like I said, when you tell somebody, you will receive positive results and positive criticism. No, no, I'm talking about going to people in the class and saying, look, opt out. This was an unfailed lawsuit. I did good work for you. Why do you want me to be essentially shaken down for whatever it is, $36,000? I didn't do the math very well. He agreed to it. He agreed to the settlement. He agreed to pay these people back their money of $600 and decided to not pay those people back. He's contacting people who are struggling. If you're in Southern California and you're not Mr. Recchia, you could probably be struggling. He's contacting these people that paid him about $500 and said, don't get your money back. Even though I didn't comply with the law, you shouldn't get your money back. Send in this opt out. Well, maybe we don't know. Maybe he's saying, I helped you. I got your – I did work for you. I got your record straightened out. Don't – I mean, there's no evidence here that he lied to anybody, is there? Correct. We don't know exactly what he said, other than what he said to Mr. Acosta. We have that under oath, and there's no conflicting evidence as to what was said to Mr. Acosta. Well, where we're at now, though, what was in front of the district court? Was it seven people? Twenty. Whoa. So how many opted out? It would be – I think it's around 30 people that opted out. And there were seven as to some issue as to the adequacy of the service. Because – The seven people never responded to the – of the 20. Of the 20. Seven never responded to the notice. Of the 20, all the people were sent by regular mail notice. Seven came back undeliverable. Undeliverable, right. Mr. Recchi's business records did not reflect their current addresses anymore. So we couldn't contact them. So it's – Mr. Recchi could not seek his benefit. I thought there were some attempts to contact them, though. They tried to do what's called a – they were talking about doing a skip trace. Did they do it? They weren't able to because they didn't have enough information. You need more information. If people have fairly common names, you can't just send letters. So what's wrong in the context of this case, which 76 is a – or whatever the number was. 74. 74. That's a small class to begin with. Sure. But what's wrong with – was there anything wrong with the notice that was given here? No. There's no argument raised to the court that there was a problem with the notice. Everybody agreed on the notice. Is that right? The notice was done both by stipulation and by Judge Gilford. The notice itself, but I mean the mailing of the notice. The mailing of the notice was done by the class administrator. How the class members were notified. The class administrator was retained by Mr. Recchia, and he provided them with all the information for the addresses. We didn't have anything to do with sending out notices. It is a small class, Your Honor. I understand that. But I don't think he should be able to benefit from his own mischief of contacting these people and saying, drop out of the class, here's the opt-out paperwork, send it in right away. Yeah, but I don't know why that's mischief. I mean, I understand the argument, but I'm not sure what – why is that mischief? Because these are people that were certified that the – Judge Gilford said these are members of the class. They appointed myself and Mr. Bragg as the class counsel. He's now contacting our clients. Did you go in to Judge Gilford and say, hey, Mr. Recchia is doing all this towards the clients? It was as part of the motion. We did, and we presented that affidavit of Mr. Acosta along with the letters he received from Mr. Recchia. And the other letters he received, he received a letter from a friend of Recchia's as well, saying please drop out, Mr. Acosta. Yes, thank you. Okay, thank you very much, Ronnie. I'll try to be as brief as I can. As dealing with the class, there was 7420. We didn't have addresses on. 34 opted out. That left 20, of which the 7 never got notice, and that left us with a 13. The only class member that you contacted was Mr. Acosta? Yes. You contacted no other? As a matter of fact, the attorney also for the class contacted him, Mr. Pietro. No, there's no reason to. I mean, all the mailings went out with the class administrator. That basically was their job. You're saying to us as an officer of the court that no one on your ñ you didn't, and no one on your behalf contacted any other class member and asked them to drop out? That's correct. Now, I've been accused of credit repair. It keeps on saying credit repair. Credit repair is the wrongful removal of rightful reported credit. So in the lower court, district court, the judge and opposing counsel agreed that there's been no evidence by me of credit repair in any of the evidence. They just held because I got the retainer and did work on behalf of my client that would improve this credit. I'm included in the group. Number two, I've cited two cases, Limpert and Lopez, ones of 2004, ones of 2009, to where they were accused of credit repair also. The court came back and said that the Limpert case is that their main product was credit counseling, and any ancillary work that they had that benefits their consumer's record is not credit repair. The second one, which is Lopez, their product was selling cars. The same thing is true, that any ancillary work and benefiting the clients is not credit repair because the product is credit counseling and sales cars. I argue the same thing. Mine is the product of law. All right. You're over your time now. Oh, I'm sorry, Your Honor. Thank you.
judges: Korman, Fletcher B. , Paez